## Case No. 5,337.

### The GEORGE LAW.

### The T. V. ARROWSMITH .

[3 Ben. 456.] [1]

District Court, S. D. New York. Nov., 1869.

COLLISION IN EAST RIVER—STEAMBOATS MEETING —SPEED—STATE LAW—APPORTIONMENT OF DAMAGES—COSTS.

1. A steamboat, the A., was going up the East river, against the ebb tide. Off her port bow or side was a ferry-boat, going the same way. The pilot of the A., seeing another ferry-boat, the L., coming down the river, a little to the starboard of his course, heading about two points on his course, and apparently crossing it, blew two whistles, and starboarded his wheel, and shortly afterwards stopped and backed his boat, but she was struck on her starboard side, by the starboard bow of the L., which, after seeing the sheer of the A., had also starboarded her wheel. The L. was coming down the river, at the rate of eleven knots an hour, with the tide, and her engine was slowed, stopped, and backed, before the collision, but not soon enough to stop her headway, while the A. was, at the time of the collision, about still in the water. *Held*, that, on the evidence, the two vessels were meeting end on, or nearly so, when the two whistles of the A. were blown, and that, under the 13th article of the act of April 29, 1864 [13 Stat. 60], it was the duty of each to port her helm.

2. If, as was claimed by the A., the L. was crossing her course from the starboard side, it was the duty of the A., under article 14, to have kept out of her way, and the duty of the L. to have kept her course.

3. The A., therefore, should have stopped and backed before she blew her two whistles.

4. The A. was not excused from the duty of porting her helm, by the law of the state of New York, requiring steamboats navigating the East river to keep in the middle of it.

5. The L. was also in fault, for running at too great speed, contrary to the 1st section of the act of the state of New York, of April 12, 1848 [Laws 1848, p. 450].

6. The A. was not excused from porting, under the 19th article of the act of April 29, 1864, by reason of the presence of the other ferry-boat on her port bow, and danger of a collision between her and the L., if the L. kept on.

7. Independent of that statute, her speed was too great, and it was her duty, under article 16 of the act of 1864, to have slackened her speed sooner than she did.

8. Both vessels being in fault, the damages must be apportioned. The question of costs was reserved till after the apportionment was made.

In admiralty.

B. D. Silliman and D. McMahon, for the Arrowsmith.

Beebe, Donohue & Cooke, for the George Law.

BLATCHFORD, District Judge. These are cross libels, the first one having been filed by the owners of the steamboat T. V. Arrowsmith, against the steam ferry-boat George Law, and the second one having been filed by the owners of the latter vessel against the former, to recover for the damages sustained by the respective vessels, by a collision, which occurred between the two vessels, on the 28th of December, 1867, shortly after three o'clock in the afternoon, in the East river, between the city of New York and the city of Brooklyn, by which both vessels were injured. The Arrowsmith was on a trip from pier 24 East river, through the East river and Hell Gate, to points beyond. The George Law was on a trip on her regular ferry route, from her slip at the foot of Bridge street, in Brooklyn, to her slip between Oliver and James streets, in New York. The tide was about half ebb, and running with considerable strength at the middle of the river, which was about where the collision happened. The weather was clear, and there was scarcely any wind.

The libel by the owners of the Arrowsmith was filed on the 18th of January, 1868, and their answer to the libel filed by the owners of the George Law was filed on the 5th of October, 1868. There is some variation in the story of the Arrowsmith, as set forth in this libel, and as set forth in this answer. Both of these pleadings allege that the Arrowsmith had got out into the middle of the river, and had straightened up, and was well on her course up the middle of the river, prior to the collision, when the pilot of the Arrowsmith observed the George Law off the Arrowsmith's starboard bow, approaching down the East river, on a diagonal course, but nearly head on to the Arrowsmith. The answer says, that the George Law was then more than a quarter of a mile off. The libel says nothing on the subject of such distance. The libel says, that the pilot of the Arrowsmith, observing such course of the George Law, blew two whistles to her, in the usual manner, and at the proper distance off, as a signal for her to starboard her helm, and pass the Arrowsmith on her starboard hand, and that the pilot of the Arrowsmith put her helm to starboard. The answer says, that such two whistles were blown by the Arrowsmith when the George Law was a quarter of a mile off from her, and omits the statement that the pilot of the Arrowsmith put her helm to starboard. Both of the pleadings allege that, at the time of the blowing of such two whistles, there was, off the port bow of the Arrowsmith, straightening up the river, and not very far from the course of the Arrowsmith, one of the Hunter's Point ferry-boats, bound to Hunter's Point, which had just come out from the bulkhead at the foot of James street, New York, and to the port side of the Hunter's Point ferry-boat, was a ferry-boat, the Superior, bound down the river, whilst, between the starboard side of the Arrowsmith and the Brooklyn shore, there was no obstruction, but a clear river. The answer then contains an allegation not found in the libel, namely, that the course of the George Law was such at the time

the pilot of the Arrowsmith blew his two whistles, that she was attempting to cross, but would have been unable to cross, the bows of the Arrowsmith and the bows of the Hunter's Point ferry-boat, and that the Arrowsmith had slowed for the Hunter's Point ferry-boat just before blowing her two whistles, and that it was impossible for the Arrowsmith to have ported her helm, and to have gone to her own starboard in time to have avoided the Goerge Law, but that the George Law could very readily have gone in the direction called for by the two whistles of the pilot of the Arrowsmith, as the river, in that direction, was free of vessels, and the tide was favorable. Both of the pleadings allege that the whistles so blown by the pilot of the Arrowsmith were clear and distinct. The libel alleges that they were given at such a distance off from the George Law, that they could have been readily heard by those on her, if they had had a proper lookout stationed, and been attentive to their business. The answer alleges that the whistles could have been readily heard by those on the George Law, if they had had a proper lookout stationed, and been attentive to their business. Both of the pleadings allege that those on the George Law did not answer in time the signals of the pilot of the Arrowsmith, as they ought to have done. The libel alleges that the George Law persisted in her aforesaid course. The answer alleges, that she persisted in her aforesaid course, across the bows of both the Arrowsmith and the Hunter's Point ferry-boat. The libel alleges, that the pilot of the Arrowsmith immediately rang his engine bells to slow, stop, and back the Arrowsmith. The answer alleges, that the pilot of the Arrowsmith immediately rang his engine bells to stop and back the Arrowsmith, she being then slowed. Both of the pleadings allege, that these bells were answered by the engineer, and that the Arrowsmith's headway was forthwith checked, so that she was, at the time of the collision, very nearly, if not quite, dead in the water. The libel alleges, that the George Law did not slow, nor stop her headway. The answer alleges, that the George Law did not stop her headway. Both of the pleadings allege, that the George Law continued on the course she was on when the pilot of the Arrowsmith first observed her, and contrary to the signals given by the pilot of the Arrowsmith, until the George Law was about from sixty to one hundred feet off from the Arrowsmith, when the pilot of the George Law blew two whistles, in answer to the two whistles of the pilot of the Arrowsmith, and did not stop her engine. The answer adds, that the two whistles blown by the George Law were blown more than two minutes after the two whistles blown by the Arrowsmith were blown. The libel alleges, that the pilot of the Arrowsmith could not have avoided the collision in any

way, as he could not port his helm, without going contrary to the signals previously given, and without attempting to cross the bows of the George Law. The answer alleges, that the pilot of the Arrowsmith could not have avoided the collision, before giving said two whistles, in any way, as she could not port her helm without going across the bows of the George Law. Both of the pleadings allege, that the Arrowsmith could not put her helm any more to starboard than she had put it, after blowing her two whistles, without being in danger of running into the Hunter's Point ferry-boat, (which bore, the libel says, off the Arrowsmith's port bow, and, the answer says, off the Arrowsmith's port side,) but that it was in the power of the pilot of the George Law to have avoided the collision, and the collision was the result of the incompetence, recklessness, and negligence of the pilot and those in charge of the George Law, in this: (1) They did not have a competent and skilful pilot in charge of the George Law, but, on the contrary, he was very much agitated at and just previous to the collision, and seemed to have lost his presence of mind, and to have, from want of a proper lookout, just discovered the Arrowsmith ahead of him at the time he blew his two whistles. (2) He had no proper or sufficient lookouts set. (3) He did not heed or follow the signal by whistles, given to him in time by the pilot of the Arrowsmith. (4) He did not check the headway of his boat in proper time. (5) He did not, in time, put his helm to starboard, by which he could have avoided the collision. The answer adds: (6) He should have taken an entirely different course in time.

The principal variations between the libel by the Arrowsmith and the answer by her are these: (1) The statement added in the answer, that the pilot of the Arrowsmith first observed the George Law when the latter was more than a quarter of a mile off. (2) The statement in the answer, that the two whistles blown by the Arrowsmith were blown when she was a quarter of a mile off from the George Law, the libel stating that such two whistles were blown at the proper distance off. (3) The omission in the answer of the statement contained in the libel, after the allegation that the Arrowsmith blew her two whistles, that her helm was put to starboard. (4) The statement added in the answer, that the course of the George Law was such, at the time the two whistles were blown by the Arrowsmith, that she was attempting to cross, but would have been unable to cross, the bows of the Arrowsmith, and the bows of the Hunter's Point ferry-boat, and that the Arrowsmith had slowed for the Hunter's Point ferry-boat just before blowing her two whistles, and that it was impossible for the Arrowsmith to have ported her helm, and to have gone to her own starboard, in time to have avoided the George Law, but that the George

Law could very readily have gone in the direction called for by the two whistles of the Arrowsmith. (5) The statement added in the answer, that, during the time between the blowing of the two whistles by the Arrowsmith, and the ringing of her engine bells, the George Law persisted in a course across the bows of both the Arrowsmith and the Hunter's Point ferry-boat, the only statement in the libel as to the course of the George Law at any time being, that it was at all times down the East river, diagonal, but nearly head on to the Arrowsmith. (6) The statement added in the answer, that the pilot of the Arrowsmith, when he observed that his signal was not answered by the George Law, and that the latter persisted in her course, rang his engine bells to stop and back the Arrowsmith, she being then slowed, the averment in the libel being, that he, at that time, rang his engine bells to slow, stop, and back his vessel. (7) The statement added in the answer, that the two whistles blown by the George Law were blown more than two minutes after the two whistles blown by the Arrowsmith were blown. (8) The statement added in the answer, that the Arrowsmith could not have avoided the collision, before giving her two whistles, as she could not port her helm without going across the bows of the George Law, there being no averment in the libel as to any inability of the Arrowsmith to avoid the collision, or port her helm, before giving her two whistles, and the averment in the libel as to the inability of the Arrowsmith to port her helm being an averment that she could not do so without going contrary to the signal previously given. The most material of these variations are, that regarding the distances between the two vessels when the George Law was first observed from the Arrowsmith, and when the two whistles were blown by the Arrowsmith; that regarding the course of the George Law, when the two whistles were blown by the Arrowsmith, and afterwards, down to the time when the two whistles were blown by the George Law; that regarding the time when the Arrowsmith was slowed; that regarding the interval that elapsed between the blowing of the two whistles by the Arrowsmith and the blowing of the two whistles by the George Law; and that regarding the inability of the Arrowsmith to port her helm, before giving her two whistles.

The libel and the answer by the George Law were both of them filed on the 28th of May, 1868. Her story in them is, that the George Law had reached a point, the libel says about one half, and the answer says about one third, of the way from the New York shore, and was heading diagonally, the libel says down and across the river, and the answer says across the river, when the Arrowsmith, the libel says at a distance off of about three lengths, and the answer does not state at what distance off, blew two whistles. The libel says, that the Arrowsmith commenced sheering towards the New York side before she blew. The answer says that she began to sheer as soon as she blew. Both of the pleadings state that the George Law, after seeing such sheer and hearing such two whistles, blew two whistles herself, and put her helm to starboard and stopped and backed, and that the Arrowsmith then blew one whistle. The answer states that the Arrowsmith did not stop or slow until the collision. Both of the pleadings state that the collision was occasioned by the fault of the Arrowsmith in these particulars: (1) In not having a lookout; (2) In not porting; (3) In not stopping and backing in time; (4) In starboarding without waiting for a response from the George Law.

The starboard side of the Arrowsmith at a point about twenty feet aft of her stem was struck by the bluff of the starboard bow of the George Law. The Arrowsmith claims $6,000 damages and the George Law claims $1,000.

It cannot fail to arrest attention, that the libel filed by the Arrowsmith states, that, when on her course up the middle of the river, her pilot observed the George Law off the starboard bow of the Arrowsmith, approaching down the river, on a diagonal course, but nearly head on to the Arrowsmith, and that it was the persistence of the George Law in such course, after the two whistles were blown by the Arrowsmith, and which course it is not alleged she changed before such two whistles were blown, that induced the pilot of the Arrowsmith to ring his engine bells to slow, stop and back. The only course stated in that libel as the course of the George Law at any time is a course down the river, and, though diagonal, nearly head on to the Arrowsmith. The answer filed by the Arrowsmith wholly departs from this statement as to the course of the George Law. Although that answer states, that the course of the George Law, when she was first observed by the pilot of the Arrowsmith, was down the East river, and, though diagonal, nearly head on to the Arrowsmith, and although it then goes on to state, that the blowing of the two whistles by the Arrowsmith was the result of the observation by her of such course of the George Law, yet it afterwards adds, what is not found in the libel filed by the Arrowsmith, that, when the two whistles were blown by the Arrowsmith, the course of the George Law was such that she was attempting to cross the bows of the Arrowsmith and the bows of the Hunter's Point ferry-boat, and that, after such two whistles were blown, the George Law persisted in her course across the bows of both the Arrowsmith and the Hunter's Point ferry-boat, and that it was such persistence of the George Law in such course that induced the pilot of the Arrowsmith to ring his engine

bells to stop and back. The testimony on the part of the Arrowsmith sustains the allegations of the libel filed by her, as to the course of the George Law, and does not sustain the allegations of the answer filed by her as to such course. Smith, the pilot of the Arrowsmith, testifies, that, when he first saw the George Law, she was very nearly head on to him, a little diagonally possibly, on his starboard bow a trifle, coming nearly at him, but not exactly at him; that she was not heading directly down but a trifle across the river; and that, if she had kept on the course she was then on, and the Arrowsmith had kept on the course she was then on, they would have hit each other. He fortifies this by saying, that, when the two whistles were blown by him, he said to his wheelsman: "If he keeps on that course he will certainly hit us;" and that, when the bells of the Arrowsmith were rung to back, the George Law was on the same course she had been on. On cross-examination, he says, that when he first saw the George Law she was heading as nearly at him as he could get at it; that, from the time the two whistles were blown by the Arrowsmith, to the time of the collision, the George Law did not sheer either way, but came as straight as she could come. Jarvis, the wheelsman of the Arrowsmith, who was in her pilot house with Smith, the pilot, testifies, that, after the George Law got headed down the river, she was coming at the Arrowsmith all the time. Merritt, a passenger on the Arrowsmith, accustomed to navigation by having followed the water, testifies, that, when the two whistles were blown by the Arrowsmith, the George Law was heading a little on the starboard bow of the Arrowsmith, nearly ahead of her; that, if neither vessel had altered her course, they would have come together; and that the George Law would have struck the starboard bow of the Arrowsmith. Tibbits, a passenger on the Arrowsmith, testifies, that he saw the George Law as soon as the two whistles of the Arrowsmith were blown; that she then seemed to be coming right at the Arrowsmith; that the two boats then seemed to him to be directly head and head, and to be in the same line; and that he noticed that the George Law did not change her course. Germain, an engineer, who has followed the water for many years and who was a passenger on the Arrowsmith, testifies, that he first noticed the George Law after the two whistles of the Arrowsmith were blown; that, at that time, the two vessels were on parallel lines; that, running on those lines, they would have come in contact; and that each would have been struck on the starboard side. This testimony on the part of the Arrowsmith, taken in connection with her pleadings, establishes, that she and the George Law were meeting end on, or nearly end on, so as to involve risk of collision, prior to and at the time the two whistles

were blown by the Arrowsmith, and so as to make it incumbent on both of the vessels, under the requirement of article 13 of the act of April 29, 1864 (13 Stat. 60), to put their helms to port, so that each should pass on the port side of the other. In the case of The Nichols, 7 Wall. [74 U. S.] 656, 663, the supreme court says: "Each vessel was seen from the deck of the other about the same time, when they were some two or three miles apart, and, as they were approaching each other from nearly opposite directions, it is quite clear, under the regulations enacted by congress, that the helms of both should have been put to port, so that each might have passed on the port side of the other, unless the distance between them at that precise time, was so great as not to involve risk of collision. Rules of navigation are obligatory upon vessels approaching each other, from the time the necessity for precaution begins, and continue to be applicable as the vessels advance, so long as the means and opportunity to avoid the danger remains." Vessels are meeting end on, within the meaning of article 13, when they are approaching each other from opposite directions, or on such parallel lines as involve risk of collision on account of their proximity, and when the vessels have advanced so near to each other that the necessity for precaution to prevent such a disaster begins; and they are meeting nearly end on, within the meaning of that article, when they are approaching from nearly opposite directions, or on lines of approach substantially parallel, and are so near to each other as to involve risk of collision. The Nichols, above cited. Under the requirement of article 13, it was plainly the duty of the Arrowsmith to have put her helm to port, on the case made in the libel filed by her and by the testimony on her part, that has been referred to.

If, as the answer filed by the Arrowsmith sets up, the George Law, at the time the two whistles of the Arrowsmith were blown, was on a course across the bows of both the Arrowsmith and the Hunter's Point ferry-boat, she must have been on the starboard side of the Arrowsmith, and the Arrowsmith must have been on the port side of the George Law. Under such circumstances, article 14 of the act of April 29th, 1864, made it the duty of the Arrowsmith to keep out of the way of the George Law, and article 18 of the same act made it the duty of the George Law to keep her course. Such duty was not properly discharged by the starboarding of the Arrowsmith or by the blowing of her two whistles, but the performance of it required that the Arrowsmith should, under article 16 of the said act, have stopped and reversed either with or without porting, at a period anterior to the time when she blew her two whistles. In any event, the course pursued by the Arrowsmith was faulty. She should either have ported or she should have stop-

ped and reversed before she did. Instead of porting, she starboarded, and, instead of stopping and reversing, at least as soon as she blew her two whistles, she blew those whistles, and waited for a response, and, receiving none, then stopped and reversed.

The 1st section of the act of the legislature of New York, passed April 12, 1848 (Laws 1848 [p. 450], c. 321), which requires all the steamboats passing up and down the East river, between the Battery at the southern extremity of the city of New York and Blackwell's Island, to be navigated as near as possible in the centre of the river, except in going into or out of the usual berth or landing place of such steamboat, is invoked to show that the Arrowsmith had a right to keep on a course as nearly as possible in the center of the river. But the act was no more applicable to the Arrowsmith than it was to the George Law. The E. C. Scranton [Case No. 4,273]. Each was bound to navigate as nearly as possible in the centre of the river. The act was not passed to promote collisions, but to prevent them. It was passed to prevent steamboats from navigating the East river close to the ends of the slips or piers. It must have a reasonable construction, and it cannot authorize any vessel to adhere blindly to a course in the centre of the river, without reference to other vessels. So construed, no two vessels could meet while navigating the East river, without colliding.

It is urged, on the part of the Arrowsmith, that there was not room for the George Law to go between the Arrowsmith and the Hunter's Point ferry-boat, which was where the pilot of the George Law was intending to carry his boat before the Arrowsmith starboarded or blew her two whistles; that the George Law had abundance of room to go, by starboarding, towards the Brooklyn shore; and that, therefore, the Arrowsmith was right in starboarding. It is also urged that, even if the Arrowsmith had ported instead of starboarding, there would not have been room for the George Law to go between the Arrowsmith and the Hunter's Point boat; and that the consequence of the porting of the Arrowsmith would have been, even if she had escaped colliding herself with the George Law, to throw the George Law against the Hunter's Point boat. These views are urged to excuse the Arrowsmith for not having ported. The ground taken is, that, under article 19 of the act of 1864, which provides that, in obeying and construing the rules prescribed by the act, due regard must be had to all dangers of navigation, and due regard must also be had to any special circumstances which may exist in any particular case, rendering a departure from the said rules necessary, in order to avoid immediate danger, the Arrowsmith was bound to regard the danger to the navigation of the George Law and of the Hunter's Point boat which would have ensued from the porting of the George Law.

The answer to these views is, that the Arrowsmith ought to have stopped and reversed, at least as soon as she blew her two whistles, and ought at the same time to have thrown her head to starboard. She would then have been free from fault. She saw that there was risk of a collision with the George Law, and, therefore, blew two whistles. It was because of the approach of the George Law, involving such risk, that the two whistles of the Arrowsmith were blown. Having starboarded, either then or previously, without waiting to know whether the George Law would starboard also, it became necessary that the Arrowsmith should stop and reverse at least as soon as she blew her two whistles. It being necessary that she should do so then, it was incumbent on her, by article 16 of the act, to do so then. If she had done so then, and her head had been then thrown to starboard, she would have been free from fault, and there would have been no occasion for any indulgence in conjecture as to whether she would or would not, by so doing, have collided with the George Law, or as to whether the Hunter's Point boat would not, or would in that event, have collided with the George Law. The tide was strongly ebb, which would have favored both the stopping of the headway of the Arrowsmith, as she was going against it, and the turning of her head to the starboard by porting. It is true that the Arrowsmith was nearly, if not quite, dead in the water, at the time the two vessels struck each other. But that does not meet the difficulty. If she had stopped and reversed sooner, she would have become dead in the water at a greater distance from the George Law, and her speed would have been retarded thereby, and by the action of the tide, so much sooner than it was, that the collision would probably have been entirely avoided or been very slight. Her libel and her answer allege, that she could not put her helm any more to starboard than she did put it after blowing her two whistles, without being in danger of running into the Hunter's Point ferry-boat, which bore, the libel says, off her port bow, and, the answer says, off her port side. Her pleadings no where allege, that, if she had stopped and reversed sooner, so as to have fallen behind the Hunter's Point boat, she could not, before her two whistles were blown, have starboarded to a greater extent than she did, without being in danger of running into the Hunter's Point boat, and to a sufficiently greater extent to have cleared the George Law. There would not have been, within the 19th article of the act, any danger of navigation incurred by the Arrowsmith by stopping and reversing sooner than she did, or by porting, as, on the evidence, there was no obstruction behind her or to her starboard side; and no special circumstances, within such 19th article, are shown to have existed, rendering a departure by the Arrowsmith from the 13th and 16th

articles necessary, in order to avoid immediate danger. On the contrary, all the danger of navigation incurred by the Arrowsmith was incurred by her not stopping and reversing sooner than she did, and by her not porting; and the evidence shows that an adherence by her to the 13th and 16th articles was necessary in order to avoid immediate danger. My conclusion, therefore, is, that the handling of the Arrowsmith contributed to the collision and that she was in fault.

The George Law was also in fault for violating the provision of the 1st section of the act of the legislature of New York of April 12th, 1848, (before cited,) which enacts, that steamboats passing up and down the East river between the Battery at the southern extremity of the city of New York and Blackwell's Island shall not be propelled at a greater rate of speed than ten miles an hour. By the testimony of the pilot of the George Law, she was going, from the time she got on her course down the river until her bells were rung to slow, stop and back, at a speed of eleven knots an hour with the tide. But, independently of the statutory provision, the George Law maintained too great a rate of speed under the circumstances. She was aiming to go through the contracted space between the Arrowsmith and the Hunter's Point boat, and was going with the tide, which was strong and nearly half ebb, and her success in doing so depended upon her being allowed to do so by the Arrowsmith. The pilot of the George Law says that, up to the time the four bells of the George Law were rung to slow, stop and back, which was done at a distance of 275 yards from the Arrowsmith, the George Law was heading about two points to the New York side of the line of the channel up and down, leaving the line of the channel about two points on his port bow; and that the Arrowsmith, up to the time she was 300 yards off from the George Law, was heading at the George Law, bearing two points on the port bow of the George Law, and heading two points on the port bow of the George Law. Under these circumstances, although the pilot of the George Law may have thought that the Arrowsmith would keep to the right, yet the George Law was approaching the Arrowsmith in such manner as to involve risk of collision, and to make it incumbent upon the George Law under article 16 of the act of 1864, to slacken her speed sooner than she did, and not to plunge on at the rate of eleven knots an hour until within 275 yards of the Arrowsmith. The neglect to slacken her speed sooner than she did was, also, on the part of the George Law, a neglect, under article 20 of the act, of a precaution required by the special circumstances of the case.

There must, therefore, be a decree apportioning between the two vessels the damages sustained by them both, with a reference to ascertain such damages. The question of costs is reserved until the coming in of the report of the commissioner.